2021 IL App (2d) 190864-U
No. 2-19-0864
Order filed May 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CM-701 |
| BENJAMIN T. KUEH, | ) ) | Honorable Joseph R. Voiland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant showed no prejudice from claimed ineffectiveness of trial counsel in eliciting alleged hearsay testimony from a police officer that defendant's wife—who suffered a fractured right forearm in an altercation with defendant—told the officer that defendant struck her on that foreman as she was recording him with her cell phone. Even without that testimony, there was ample evidence disproving defendant's self-defense claim that the wife was the aggressor and that her forearm was fractured when he blocked her punch.

¶ 2    Defendant, Benjamin T. Kueh, appeals his conviction, following a bench trial, of two

counts of misdemeanor domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2), (b) (West 2016)). He

argues that he was denied the effective assistance of counsel when trial counsel elicited testimony

that defendant claims was inadmissible and posttrial counsel failed to raise the claim in a motion for a new trial. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4       On November 30, 2017, defendant was charged by complaint with two counts of domestic battery, stemming from an incident with his wife, Joyce Kueh, that occurred that day. Count I alleged that defendant knowingly caused bodily harm to Joyce by striking her on the right forearm and breaking a bone in that forearm (see *id.* § 12.3.2(a)(1)). Count II alleged that defendant knowingly made contact of an insulting or provoking nature with Joyce in that he placed his hands on her, striking and pushing her (see *id.* § 12-3.2(a)(2)). The matter proceeded to a bench trial, at which defendant was represented by private counsel. Defendant raised the affirmative defense of self-defense.

¶ 5       On November 13, 2018, the day the trial was set to begin, the State filed a motion to continue, advising the trial court that it had made several attempts to serve Joyce at two different addresses and asking for a final chance to serve her. The trial court granted the motion. On January 8, 2019, the parties answered ready for trial. Joyce was not present.

¶ 6       The State presented three witnesses. Emergency room doctor Rajeev Kalsi testified that Joyce arrived at Rush-Copley Medical Center via ambulance on the morning of November 30, 2017. He treated her at approximately 7:25 a.m. Kalsi identified People's exhibit No. 3 as his notes, documenting his encounter with Joyce. According to Kalsi, Joyce told him that there was a "verbal altercation" between her and defendant regarding infidelity and concern over a divorce. Kalsi testified: "And subsequently there was a physical altercation where she, somebody threw a, I think she stated that he threw a phone at her, and she defended herself with her forearm." When asked whether Joyce told him that defendant hit her forearm, Kalsi testified: "To my recollection, it was

- 2 -

an object thrown at her." Kalsi was allowed to use his notes to refresh his recollection as to the nature of the contact that defendant had with Joyce. The following colloquy ensued:

"Q. And specifically, Doctor, I'm going to ask you to refresh your recollection as to what and who made contact with her.

A. So to clarify what I documented was that—

[THE STATE]: And just for the record, I'm going to take Exhibit 3 back.

THE WITNESS: Oh, sure.

That he, he missed her with the phone, but then impacted her with his own fist."

When asked if Joyce told him "where her husband hit her with his fist," Kalsi responded: "It was the forearm that was indicated." The prosecutor noted for the record that Kalsi "raised his right forearm and his left hand did touch the area just below his wrist." Kalsi testified further that X-rays revealed a "fracture of *** the distal ulna," which is "the area just below the wrist here on the pinky side." This is the same area where Joyce indicated she was hit. Kalsi treated Joyce with a splint. Kalsi testified that Joyce's bones "looked like healthy bones."

¶ 7     Kalsi testified that he asked Joyce if she needed him to contact the police or social services. Joyce declined, expressing concerns about "family, repercussions, in particular her children, as well as how it would look on her, in terms of making these accusations of her husband." Kalsi documented that Joyce "was concerned about, from a standpoint of cultural sensitivity to what her children would think about her making accusations like this." Kalsi described Joyce as "someone who was timid or afraid and reluctantly participating in [his] engagement with medical intervention." Kalsi observed a bruise on Joyce and she told him that it was from "an altercation" with defendant a week ago.

¶ 8    On cross-examination, Kalsi agreed that he could not say whether Joyce's injury was defensive or offensive or whether it was accidental or purposeful. Kalsi was also asked about his reference to a "cultural issue." Kalsi stated: "My assessment is something that I pulled from my own cultural understanding, my own ethnic background. Insomuch as that it seemed that she was concerned that if she were to be outspoken about being abused, she would get reprimanded by her family for casting shame on her husband."

¶ 9    City of Yorkville police officer Robbie Hart testified that he responded to a domestic battery call at a home in Yorkville at about 6:38 a.m. on November 30, 2017. When Hart arrived, defendant was in the garage, and Joyce was inside the house. Joyce was visibly upset and holding her right arm. Joyce told Hart what had happened. Joyce was taken via ambulance to the hospital, where Hart later met with her. Hart identified photographs taken of Joyce at her home, including photographs of her hands, and at the hospital with a splint on her arm.

¶ 10    On cross-examination, defense counsel asked Hart if Joyce discussed with him the nature of her relationship with her husband. Hart responded:

"When I spoke to her, I asked her what happened. She said that she was upset. Her and her husband got in a verbal argument about him having a girlfriend, and that she had taken her cell phone out to record both—record him, and he had struck her in the right arm to knock out the cell phone to stop recording him."

¶ 11    City of Yorkville police officer Roman Soebbing testified that he also responded to the call at about 6:36 a.m. on November 30, 2017. When Soebbing arrived, he encountered defendant, who was in the garage, and Soebbing asked him what had happened. Soebbing testified:

"He said that he had just gotten home from work. He stated that he had went into his computer room once he got home. He stated his wife came into the computer room

where he was at. He stated that they started verbally arguing. She claimed that he had a girlfriend. She started audio recording him on her cell phone. He did not want to be audio recorded.

He stated that he struck her right forearm, knocking the phone out of her hand. And at that time, she got angry and started hitting him."

Thereafter, Joyce called the police. Soebbing testified that defendant told him that he had been hit on the lip. Defendant showed him a bruise on his lip. When Soebbing entered the house, the paramedics were on the scene preparing Joyce for transport to the hospital.

¶ 12    On cross-examination, Soebbing testified that Joyce acknowledged striking defendant but did not state whether she struck him on the lip.

¶ 13    On redirect examination, Soebbing agreed that Joyce told him that she had hit defendant. Thereafter, the following colloquy took place:

"Q. Did she indicate to you that that was after he hit her on the right forearm?

A. Yes.

Q. Did she ever indicate to you that she hit him before he made physical contact with her?

A. No.

Q. Did she indicate to you that her husband had made physical contact with her first?

A. Yes.

Q. That being her right forearm?

A. Yes.

Q. And she indicated when he made that contact, that he knocked the cell phone out of her hand?

A. Yes."

¶ 14 Defendant testified that he was almost 69 years old and had been married to Joyce since 1974. Defendant was employed as "an IT person" and an "Uber or Lyft" driver. Defendant testified that he and Joyce did not get along very well and that he tried to stay away from her. Defendant testified that Joyce calls him when he is at work and that, if he does not pick up, she will call him repeatedly. Defendant also testified that Joyce used her phone to videotape him, "including when [he] was in the toilet." Defendant testified that he has asked Joyce to stop recording him.

¶ 15 Defendant testified that, on November 30, 2017, he returned home from work in the early morning hours to pick something up from the house and leave again. Joyce asked him why he did not answer the phone when she had called him. Joyce started video recording him with her phone. Defendant went into his computer room and Joyce followed him. According to defendant, as he walked past Joyce to exit the room, he extended his arm. When he did so, his left hand hit her phone. Defendant testified:

"The phone dropped, and I tried to pick it up, but she—at the time when I tried to pick up, she slapped my head, okay. And then at that time when I pick up the phone, I saw her try to hit me again, so I just do this to block it."

Defendant "indicat[ed] an upward move with [his] left arm." Defendant testified that Joyce said that she felt pain and called 911. When asked whether Joyce's arm struck his left arm, defendant testified: "I couldn't—I didn't see because it was still dark. And then basically, you know, it's like, I just don't want her to hit me again, because a week before I was like [*sic*] a broken lip." Defendant went to the garage to load something into the car and the police arrived.

¶ 16    Defendant testified that, one week before the incident, on November 24, 2017, he and Joyce had had an altercation. Defendant stated that the "same thing" happened. Joyce was video recording him and her phone "dropped." She picked it up and hit him in the face with the phone. Defendant identified defense exhibit No. 2, a picture of himself that he had taken on November 24, 2017, after the incident, and defense exhibit No. 3, showing "the same lip injury" three days later. Defendant testified that, since 2013, he has had seven other physical altercations with Joyce, which included a 2013 incident that he reported to the police and for which Joyce was arrested. He identified photographs of himself showing various injuries he allegedly sustained as a result of these altercations.

¶ 17    On cross-examination, defendant agreed that it upset him when Joyce called him repeatedly and recorded him with her phone. Defendant denied hitting Joyce on the morning in question. Defendant testified that she was holding the phone at the bottom with two fingers; her thumb was on the record button. Defendant testified he "touched the phone" and "then the phone dropped." He stated that Joyce slapped his face when he was picking up the phone. The prosecutor asked, "[Y]ou wanted to get the phone back to her?" and the following colloquy occurred:

> A. Yeah. Because it dropped to the floor. I tried to pick it up and give it to her.
>
> Q. Okay. So you said you knocked it out of her hand, and then you wanted to give it back to her?
>
> A. Uh-huh.
>
> Q. Yes?
>
> A. Yes."

Defendant testified that Joyce slapped him as he was picking up the phone. He stated:

"And then on the way try [*sic*] coming up and give her the phone, I saw, you know, like this from the side, I saw her hands coming down, that's why I, you know, it is kind of like a reaction, you know. It just happened."

The prosecutor asked, "So you kind of just swatted?" and defendant replied, "Yeah, I swatted." Defendant denied telling Soebbing that he hit Joyce.

¶ 18    The State argued in closing that there was no question that Joyce suffered bodily harm where Kalsi testified that he observed a fracture to Joyce's right forearm just below her wrist. The State also noted Kalsi's testimony that Joyce told him that she was hit in the forearm where Kalsi observed the fracture. Also, the State pointed to Soebbing's testimony that defendant told him that he hit Joyce's forearm and that she hit him after he had hit her. The State further argued that defendant's testimony about the amount of force that he used did not make sense and that if he had just swatted at her it would not have broken Joyce's arm. The State also argued that the testimony established that defendant was upset about the phone and that he purposefully hit Joyce.

¶ 19    In response, defense counsel argued that there was no doubt that Joyce's forearm was injured, but counsel asserted that Kalsi used the term "impacted" rather than hit and could not say whether the injury was defense or offensive. Counsel argued that "it is just as likely that [Joyce's] ulna fracture occurred as [defendant] was deflecting yet another hit from Joyce. And she was impacted on her forearm, and that's how it became broken." Counsel argued that Joyce was seeking "retribution" for the fact that defendant had her arrested in 2013.

¶ 20    The trial court found defendant guilty of both counts. The court rejected defendant's claim of self-defense, stating that the evidence was clear that defendant was the aggressor. The court found defendant's testimony incredible, specifically his claim that, immediately before the

physical altercation took place, Joyce's phone fell to the floor and he went to pick up the phone to hand it back to her. The court stated:

> "It makes no sense to me that if you're upset with her filming you or videoing you, that you would give her back her phone or that you—or that the phone accidentally fell, and then you picked it up, being the gentleman that you were."

The court also noted the other testimony presented, which it found "competent and credible." The court noted Kalsi's testimony that "in treating [Joyce] she indicated very clearly and succinctly, even though he may have put it in medical terms, but she said he, meaning the defendant, hit me in the arm with his fist." The court went on to note that Kalsi's testimony was corroborated by Hart "who indicated that, again, she told him, my husband, he hit me" and further corroborated by defendant's statement to Soebbing that he "struck [Joyce] and knocked the phone out of her hand." The court found Soebbing to be "very credible," noting that "[h]is job is to find out what happened, and he's trained to do that" and "in this case he did a very good job determining what happened in this case."

¶ 21    Thereafter, the trial court merged the two counts and sentenced defendant to 12 months' conditional discharge, imposed various assessments, and ordered defendant to successfully complete domestic violence counseling.

¶ 22    Defendant filed a *pro se* motion to reconsider the judgment. The trial court subsequently appointed the public defender to represent defendant. Thereafter, counsel filed an amended motion for a new trial. Counsel did not claim in the motion that trial counsel was ineffective for eliciting Hart's testimony that Joyce told him that defendant had struck her on the right arm. The trial court denied the motion.

¶ 23    This timely appeal followed.

¶ 24                              II. ANALYSIS

¶ 25    Defendant argues that Hart's testimony during cross-examination—that Joyce told him that defendant "had struck her in the right arm to knock out the cell phone and stop recording him"—was inadmissible hearsay and, in addition, was barred by the confrontation clause (U.S. Const., amends. VI, XIV). Defendant argues that defense counsel provided ineffective assistance of counsel by eliciting this testimony and that posttrial counsel provided ineffective assistance of counsel by failing to raise the issue in the amended motion for a new trial.

¶ 26    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Also, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* If a claim may be determined on the basis that there is no prejudice, a reviewing court need not consider if counsel's performance was deficient. See *id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed."); *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶ 50 (courts may resolve ineffectiveness claims by reaching only the prejudice component of *Strickland*, because lack of prejudice renders counsel's performance irrelevant).

¶ 27    To prove defendant guilty of domestic battery, the State had to prove beyond a reasonable doubt that defendant knowingly caused bodily harm to Joyce by striking her on the right forearm and breaking a bone in that forearm (count I) (720 ILCS 5/12-3.2(a)(1) (West 2016)) and that defendant knowingly made contact of an insulting or provoking nature with Joyce in that he placed his hands on her, striking and pushing her (count II) (*id.* § 12-3.2(a)(2)). Because defendant raised

the affirmative defense of self-defense, the State was also required to prove beyond a reasonable doubt that defendant did not act in self-defense. *People v. Gray*, 2017 IL 120958, ¶ 50. The elements of self-defense are as follows: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. 720 ILCS 5/7-1 (West 2016); *Gray*, 2017 IL 120958, ¶ 50. "If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails." *Gray*, 2017 IL 120958, ¶ 50. In addition to finding that the State proved defendant guilty beyond a reasonable doubt of both counts of domestic battery, the trial court also found that the evidence negated defendant's claim that he was not the aggressor.

¶ 28    Here, we need not consider whether defense counsel performed deficiently in eliciting Hart's testimony, because defendant cannot establish prejudice. Defendant argues that he suffered prejudice, because "the State's case turned on the credibility given to [Joyce's] prior statements made to [Kalsi]," which was corroborated by Hart's testimony. To be sure, Hart's testimony corroborated Joyce's statement to the doctor. However, given the totality of the evidence, we cannot say that, without Hart's testimony, there was a reasonable probability that the trial court would have found the evidence insufficient to prove defendant guilty beyond a reasonable doubt.

¶ 29    First, Soebbing's testimony was strong evidence of defendant's guilt. Soebbing testified that defendant admitted that he struck Joyce. According to Soebbing, when he arrived on the scene, he encountered defendant in the garage. Defendant told him "that he struck [Joyce's] right forearm, knocking the phone out of her hand." The court found Soebbing to be "very credible," noting that "[h]is job is to find out what happened, and he's trained to do that" and "in this case he did a very

good job determining what happened in this case." Soebbing also testified on redirect that he spoke with Joyce, who admitted to striking defendant but stated that defendant made contact with her right forearm first.

¶ 30    In addition to Soebbing's testimony, Kalsi testified regarding his encounter with Joyce at the emergency room and his treatment of her injury. Kalsi testified that Joyce sustained a fracture to her right wrist, in the area where she indicated that she was hit. Kalsi testified that his notes reflected that defendant "impacted [Joyce] with his own fist." To be sure, Kalsi used the word "impacted" rather than "hit" in describing the event. It is not clear whether "impacted" was Joyce's word or Kalsi's. Nevertheless, even if Joyce described the incident as an "impact" rather than a "hit," her attempts to lessen the severity of defendant's actions were consistent with Kalsi's description of Joyce as someone who was "reluctantly" participating in medical treatment, given her concern "that if she were to be outspoken about being abused, she would get reprimanded by her family for casting shame on her husband." We note that Kalsi did not dispute the prosecutor's characterization of the incident as a "hit." When the prosecutor asked if Joyce told him "where her husband hit her with his fist," Kalsi responded: "It was the forearm that was indicated." In addition, although Kalsi initially testified (without his notes) that Joyce was injured when defendant threw a phone at her, Kalsi also stated that Joyce "*defended herself* with her forearm." (Emphasis added.) Thus, although Kalsi needed his notes to refresh his recollections as to the details of Joyce's encounter with defendant, Kalsi's testimony as to the general nature of the physical altercation, *i.e.*, that Joyce was *defending* herself, is evidence that defendant was the aggressor. This is so despite Kalsi's testimony that he was unable to tell from the injury itself whether it was caused offensively or defensively.

¶ 31    Although defendant denied hitting Joyce and denied telling Soebbing that he hit Joyce, the trial court made clear that it found defendant's testimony incredible. Indeed, defendant's version of the events strains credulity, because he testified that, despite knocking the phone from Joyce's hand out of frustration with her recording him, he nevertheless stopped to pick up the phone and hand it back to her. This is especially suspect, given his testimony that, when the same situation occurred one week earlier, Joyce allegedly picked up the phone and hit him in the face with it. Picking up the phone to prevent Joyce from using it as a weapon would make sense; picking it up only to hand it back to her definitely would not. We note, too, that defendant claimed to be acting defensively when he "swatted" with his left arm. However, when asked whether Joyce's arm struck his left arm, he testified: "I couldn't—I didn't see because it was still dark." Certainly, if his claimed defensive move caused Joyce to hit his arm with sufficient force to fracture her own forearm, defendant would have felt it, regardless of the lighting conditions. Defendant's version was simply unbelievable. See *People v. Hart*, 214 Ill. 2d 490, 520 (2005) ("If a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities.")

¶ 32    The cases relied on by defendant in support of his claim that he was prejudiced by the admission of Hart's testimony are readily distinguishable, because in each case the improperly admitted hearsay evidence was critical evidence of the defendant's guilt. See *People v. Bailey*, 374 Ill. App. 3d 608, 614-15 (2007) (at the defendant's trial for possession with intent to deliver, where no other factors usually associated with an intent to deliver were present, defense counsel elicited testimony that was the "key" evidence linking the defendant to an unknown man standing on a nearby street corner yelling " 'rocks' " at passing cars); *People v. Moore*, 356 Ill. App. 3d 117, 129-30 (2005) (at the defendant's trial for burglary, defense counsel elicited incriminating hearsay

testimony that explained the absence of the only physical evidence that would have connected the defendant to the burglary); *People v. Phillips*, 227 Ill. App. 3d 581, 584-90 (1992) (at the defendant's trial for armed robbery, where the only other evidence against defendant was the victim's brief and flawed eyewitness testimony, defense counsel elicited "devastating" hearsay testimony from a robbery suspect who stated the defendant was the likely perpetrator because he and the defendant had been previously arrested for robbery). Here, unlike in *Bailey*, *Moore*, and *Phillips*, Hart's testimony was not similarly critical, given the totality of the evidence presented.

¶ 33    Based on the foregoing, we cannot say that there is a reasonable probability that the result of the trial would have been different absent trial court's allegedly deficient performance. Therefore, defendant's ineffective-assistance-of-trial-counsel claim fails for lack of prejudice. It follows that posttrial counsel was not ineffective for failing to raise that claim in the motion for a new trial. See, *e.g.*, *People v. Peco*, 345 Ill. App. 3d 724, 735-36 (2004) (counsel not ineffective for failing to raise an unmeritorious posttrial claim).

¶ 34                                 III. CONCLUSION

¶ 35    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 36    Affirmed.